[Crim. No. 44104. Second Dist., Div. Seven. Aug. 27, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR S. MARTINEZ, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Suzan E. Hier, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Edward T. Fogel, Jr., and Donald E. De Nicola, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BEVERLY, J.\*—**

### Statement of the Case

Appellant was charged by information in count I with the murder of Richard Sandoval in violation of Penal Code section 187, as well as an allegation

---

\*Assigned by the Chairperson of the Judicial Council.

of the use of a dangerous and deadly weapon in violation of Penal Code section 12022, subdivision (b), and the infliction of great bodily injury within the meaning of Penal Code section 1203.075. He was charged in count II with assault with a deadly weapon against Susan Martinez in violation of Penal Code section 245, subdivision (a). The jury found appellant guilty of second degree murder in count I, and found the special allegations to be true. He was found not guilty of the charge in count II. Probation was denied, and appellant was sentenced to state prison for a term of 16 years to life.

Appellant appeals from the judgment of conviction.

### Statement of Facts

As they relate to our ultimate ruling, the relevant facts are that appellant and his wife, Susan Martinez, separated in early August 1981. Appellant moved out of their apartment in Santa Fe Springs and took up residence at his mother's home.

On September 11, Susan Martinez attended a party in her apartment complex with Richard Sandoval, whom she had been dating, and his uncle, Mario Pompa. They all returned to the Martinez' apartment about 4 a.m. Susan Martinez and Richard Sandoval went to bed together, and Mr. Pompa fell asleep on the living room sofa.

About 5 o'clock that morning, appellant appeared at the door of his wife's bedroom and saw his wife and Richard Sandoval engaged in sexual intercourse. Appellant began screaming and cursing, and rushed to the bed, wielding a long knife. He struck Susan Martinez in the head, stabbed at the bed, and chased Mr. Sandoval into the bathroom. There he pinned Mr. Sandoval behind a door and began stabbing at him with the knife. Mrs. Martinez exclaimed, "Stop it, Art. You are going to kill him. Stop it." Appellant was saying, "I'm going to kill you, mother fucker, I'm going to kill you. You ain't never going to come back up here again."

Susan Martinez pulled on appellant's hair and clothes and eventually managed to grab hold of the knife by its blade. Appellant yelled to her to let go, while she pleaded with him to stop and told Mr. Sandoval to run. Mr. Sandoval and Mrs. Martinez then pushed appellant to the floor and fled in different directions.

Mr. Sandoval started out of the apartment. Appellant followed him and his neighbors began to look out of their windows and doors. Appellant pushed Mr. Sandoval against a wall and began slashing at him. Appellant

was yelling, "I am going to kill him. I'm going to kill him." A neighbor, Mr. Louie Perez, called out for appellant to "leave him alone." Appellant responded, "I am going to kill him. . . . If he keeps fucking around with my wife, I'm going to kill him." Mr. Sandoval began to crawl up the stairs of a neighboring apartment, and appellant again swung at him with the knife, barely missing his neck. When Mr. Perez again called for appellant to stop, appellant ran from the scene. Mr. Sandoval collapsed on the apartment house stairs.

Police and paramedics arrived and transported Mr. Sandoval and Mrs. Martinez to the hospital. Mr. Pompa followed in his own rented car which had been parked near appellant's residence. As he was following, Mr. Pompa realized that one of the car's tires was flat. After arriving at the hospital he saw that the tire had been slashed, and that certain personal belongings— a book, cassette tapes, business cards, and Mr. Sandoval's shaving kit—had been removed. The police, a few days later, found these items inside appellant's van.

### Improper Instruction After Substituting a Juror During Deliberations

■ Appellant contends that the trial court erred in failing to properly instruct the jury after substituting a juror during deliberations. After deliberations had begun, it was stipulated by counsel for both sides that juror No. 7 be excused. An alternate was chosen by lot and the court gave the following admonition: "Now that there is a new member of the jury, the jury will resume their deliberations starting over with the new trial juror. [¶] The trial jury may return to the jury room." The jury then retired for further deliberations.

The People concede that the above language does not meet the requirements set forth in *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742]. In construing Penal Code section 1089, the court in *Collins* stated: "[A] proper construction of section 1089[1] requires that deliberations begin anew when a substitution is made after final submission to the jury. This will ensure that each of the 12 jurors reaching the verdict has fully participated in the deliberations, just as each had observed and heard all proceedings in the case. We accordingly construe section 1089 to provide that the court instruct the jury to *set aside and disregard all past deliberations* and begin deliberating anew." (*Id.,* at p. 694; italics added.)

---

[1]Penal Code section 1089 sets forth the procedure for choosing and substituting alternate jurors.

The People, however, contend that the trial court essentially complied with the mandate in *Collins* when it told the jurors to "resume their deliberations *starting over with the new trial juror.*" We disagree. The trial court's mandate clearly instructed them to "start over" with the new juror, but they were not instructed to set aside and disregard all past deliberations. This was the crucial error. In *Collins* the court mentioned that Penal Code section 1089 fails to expressly require that each of the 12 jurors reaching the verdict fully participate in the deliberations. The error in failing to admonish a jury to disregard all past deliberations is that it introduces the likelihood that the opinions and feelings of a juror who was discharged may be used by the panel as finally composed in arriving at a verdict. This obviously runs a foul of *Collins* because, if that happens, the decision is not entirely that of the 12 jurors who ultimately reach the verdict. CALJIC No. 17.51,[2] drafted to comply with the provisions of Penal Code section 1089 and *People* v. *Collins, supra,* contains that admonition.

■ The People nonetheless maintain that the error was harmless in that there appears no reasonable probability that a more favorable verdict would have been returned had the jury been properly instructed following the substitution. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) We again disagree. This is a close case. The issues of premeditation and malice are not simple in this case. Appellant arrived at the apartment which he shared off-and-on with his estranged wife to find her engaged in an act of sexual intercourse in their bedroom. Whether or not appellant had the knife with him upon his arrival in the apartment, or whether it was in the bedroom drawer as he contends, bears on both issues, and requires a factual determination that cannot be labeled simple. Likewise, the passage of time between appellant's initial reaction at the bedroom door and his attack of the victim at that point, to his ultimate attack on the street after the victim fled the apartment, of necessity, requires a balancing of all of the attendant evidence in deciding whether or not a cooling-off period had taken place, to determine whether the offense was murder or manslaughter.

In support of its position, the People point out that the jury, including the recently substituted juror, heard a lengthy reading of the testimony of both

---

[2]CALJIC No. 17.51 provides: "Ladies and Gentlemen of the Jury:

"One of your number has been excused for legal cause and replaced with an alternate juror. You must not speculate or consider for any purpose the reasons for such excuse.

"The People and [each] [the] defendant have the right to a verdict reached only after full participation of the twelve jurors who ultimately return the verdict.

"This right may be assured in this case only if the jury begins its deliberations against from the beginning.

"You are therefore instructed to set aside and disregard all past deliberations and begin deliberating anew. This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place.

"You shall now retire for your deliberations in accordance with all the instructions previously given."

Susan Martinez and appellant before arriving at a verdict. The People further point out that a comparison of time spent deliberating before and after the substitution of the alternate juror is a factor in deciding whether the error was harmless. The jury was in deliberation over the course of six days after the substitution. The problem is that they were in deliberation for approximately two and one-fourth hours before the substitution, which was sufficient time to formulate the danger that is likely without the proper instruction.

Since we remand the case for a new trial, appellant's remaining contentions are not considered.

### *Disposition*

The judgment is reversed and the case is remanded for a new trial.

Johnson, Acting P. J., and Thompson, J., concurred.

A petition for a rehearing was denied September 26, 1984.